## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE JONES (#B-39920), | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 8789 |
| | ) | |
| v. | ) | |
| | ) | Judge John Z. Lee |
| RANDY PFISTER, VICTOR | ) | |
| CALLOWAY, and TARRY WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Andre Jones, a *pro se* Illinois state prisoner, has brought this civil rights action under 42 U.S.C. § 1983, claiming he was exposed to mold in Stateville Correctional Center's law library, as well as in other areas in the prison, and that the mold affected his respiratory health. Jones alleges that the prison's wardens, by failing to fix the mold problem, acted with deliberate indifference to a substantial risk of serious harm to his health in violation of his Eighth Amendment rights. Defendants have moved for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

### I.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this judicial district. *See generally* LR 56.1. Under this rule, a party filing a motion for summary judgment under Fed. R. Civ. P. 56 must serve and file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." LR 56.1(a)(3); *see Horne v. Elec. Eel Mfg. Co., Inc.*, --- F.3d ----, No. 19-2082, 2021 WL 486925, at *1 n.1 (7th Cir. Feb.

10, 2021). Each fact must be supported by "specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(a).

In turn, the party opposing summary judgment must include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" *Horne*, 2021 WL 486925, at *1 n.1 (quoting LR 56.1(b)(3)(B)). In addition, the nonmovant may file "a statement . . . of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (quoting LR 56.1(b)(3)(C)). "The Rule warns, 'All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.'" *Id.*

That a party opposing summary judgment is *pro se* does not excuse that party from complying with procedural rules. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008); *see Coleman v. Goodwill Indus. of Se. Wis.*, 423 F. App'x 642, 643 (7th Cir. 2011) (affirming the district court's adoption of the defendant's fact statements where the plaintiff opposed the motion for summary judgment with supporting affidavits but failed to submit a paragraph-by-paragraph response to the defendant's statements of facts with citations to the record).

Consistent with Local Rule 56.1, Defendants filed a "Statement of Uncontested Material Facts" along with their motion for summary judgment. *See* Defs.' LR 56.1(a)(3) Stmt. ("Defs.' SOF"), ECF No. 88-1. Also, Defendants filed and provided Jones with a Local Rule 56.2 Notice. *See* Defs.' LR 56.2 Notice to *Pro Se* Litigant Opposing a Motion for Summary Judgment, ECF No. 88-3. The notice instructed:

Your Rule 56.1 statement needs to have numbered paragraphs responding to each paragraph in the defendants' statement of facts. If you disagree with any fact offered by the defendants, you need to explain how and why you disagree with the defendants. You also need to explain how the documents or declarations that you are submitting support your version of the facts.

*Id.* at 1. The notice also warned Jones that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *Id.* at 2; *see Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014).

Despite these admonitions, Jones did not respond to Defendants' statement of facts. Rather, he filed his own "Local Rule 56.1 Statement of Disputed Factual Issues that Preclude Summary Judgment," which contains paragraphs-long blends of factual assertions and legal arguments. *See* Pl.'s LR 56.1 Stmt. Disputed Factual Issues ("Pl.'s SOAF"), ECF No. 91.

That said, Jones's failure to comply with Local Rule 56.1 does not automatically result in judgment for the Defendants. *See Keeton v. Morningstar*, 667 F.3d 877, 884 (7th Cir. 2012). The Defendants must still demonstrate that they are entitled to judgment as a matter of law. *See id*. And, as always, the Court views all of the movants' facts, as well as all reasonable inferences drawn therefrom, in the light most favorable to Jones, the nonmovant. *See id*.

Because Jones is proceeding *pro se*, the Court has considered the factual assertions in his responses to the extent they are supported by admissible evidence.[1] *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Brooker v. Abate*, No. 18 CV 50111, 2020 WL 5819872, at *1 (N.D. Ill. Sept. 30, 2020); *see also* Fed. R. Evid. 602. The Court, however, has ignored any factual assertions that conflict with prior, sworn testimony, as well as hearsay statements, legal arguments and conclusions set forth as "facts," any declaration that speculates as to other people's mindsets,

---

[1] The Court also considers Jones's thirty-two-page response brief, although he did not seek leave to file an oversized brief. *See* LR 7.1.

and statements concerning matters about which only an expert could properly testify. *See Jones v. DeJoy*, No. 18 CV 1213, 2020 WL 6716218, at *1–2 (N.D. Ill. Nov. 16, 2020) (striking offending portions of Rule 56.1 statements that were "riddled with argument, unsupported assertions, and in some cases factual allegations beyond those set forth in the paragraph to which [plaintiff] was responding"); *Campbell v. City of Chi.*, No. 16 CV 6000, 2018 WL 4637377, at *1 (N.D. Ill. Sep. 27, 2018) ("Purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements."). With these caveats in mind, the Court turns to the relevant facts.

## II.     Factual Background[2]

Except for short periods of incarceration at other facilities, Jones was an inmate at the Stateville Correctional Center from 2002 to 2016. Defs.' SOF ¶¶ 1, 6. Defendant Tarry Williams was the Warden from 2014 to 2015, Defendant Victor Calloway was the Assistant Warden from 2014 to 2015, and Defendant Randy Pfister was the Warden from 2015 to 2018. *Id.* ¶¶ 2–4.

### A.     Mold at Stateville

#### 1.     Law Library

While incarcerated at Stateville, Jones was employed as a law clerk in the prison law library from 2011 to 2015. *Id.* ¶ 6; *see* Pl.'s SOAF ¶¶ 6, 12; Pl.'s Ex. 25, Rodriguez Decl. ("Rodriguez Decl.") ¶ 2, at 107,[3] ECF No. 94 (stating that he worked alongside Jones in 2014 and 2015). He also regularly performed legal research in the law library in connection with his own litigation

---

[2]     The following facts are either undisputed or have been deemed admitted by a party's noncompliance with Local Rule 56.1.

[3]     Because Jones has filed 357 pages of exhibits in a group exhibit, for the reader's ease of access, the Court includes the specific ECF page number.

throughout his confinement at Stateville. Defs.' SOF ¶ 6. In addition, Jones sometimes attended classes that were conducted in the law library. *Id.*

Jones has provided ample evidence regarding the prevalence of mold in the law library. Because the law library's roof leaked from 2003 to 2016, large containers were placed throughout the library to catch any water. Pl.'s SOAF ¶ 7; Pl.'s Ex. 22, Patterson Aff. ("Patterson Aff.") ¶ 2, at 101, ECF No. 94. And, due to past leaks, the carpet in the law library emitted a very bad odor. Patterson Aff. ¶ 2; Pl.'s Ex. 23, Jones Aff. ¶ 2, at 103, ECF No. 94. In fact, on July 21, 2014, Calloway issued a memorandum stating that "most of the books in the library have some form of mold on them due to the leaking roof." Pl.'s Ex. 6, 7/21/14 Warden Calloway Mem. ("Warden Calloway Mem."), at 49, ECF No. 94. The memorandum further stated that "there are two carts of books available for general reading purposes that do not have mold of [sic] them." *Id.*

On July 22, 2014, Stateville School Principal Gail Sessler and Calloway surveyed and inspected the mold in the law library. Pl.'s SOAF ¶ 10; Defs.' Ex. B, Jones Dep. ("Jones Dep.") at 76:24–78:4, ECF No. 97. Calloway returned to the law library on July 28, 2014, and told Principal Sessler to remove the books that were wet and moldy. Pl.'s SOAF ¶ 11; Jones Dep. at 78:15–79:23. On August 6, 2014, Jones's supervisor, Phyllis Baker, instructed him to record the titles of all the books that needed to be discarded. Pl.'s SOAF ¶ 12; Jones Dep. at 79:23–80:3. And, on November 14, individuals from Stateville's internal affairs division visited the law library to take photographs of the ceiling, carpet, shelves, and books. Pl.'s SOAF ¶ 14; Jones Dep. at 78:7–14, 79:14–80:7. As of November 17, 2014, however, the books still had not been removed. Pl.'s SOAF ¶ 13; Defs.' Ex. G, 11/17/14 Mem. from G. Sessler to C. Boyd ("Letter to Administration"), ECF No. 88-10 (requesting that they be removed).

5

Jones does not recall seeing Pfister, Calloway, or Williams in the library after November 2014. Defs.' SOF ¶ 15. He posits that he may have had a conversation with Pfister, but he cannot remember anything about the conversation.[4]  *Id.* ¶ 16.

Due to the ongoing problems with the leaking library roof, Stateville's engineering department inspected the building that housed the library in 2016. Pl.'s Ex. 15, Patterson Grievance ("Patterson Grievance") at 76, ECF No. 94; *see id.*, Chief Engineer's Resp. ("Chief Engineer's Resp. 12/5/15 Patterson Grievance"). The department concluded that the building envelope had been compromised and that the building needed a new roof. *Id.*

Furthermore, Stateville's Chief Engineer Jermiagh Daly recommended that any questionable substances be washed and cleaned with a bleach and water solution and that any items, such as books, that could not be cleaned should be discarded. *Id.* Daly also instructed that "[b]uckets and/or containers collecting water from the roof need to be emptied regularly." *Id.* He also noted that the carpet had been only recently removed and discarded. *See id.* *But cf.* Pl.'s Ex. 25, Rodriguez Decl. ("Rodriguez Decl.") ¶¶ 1, 9–12, at 108, ECF No. 94 (stating that the carpet was not completely removed until 2018).

Another inmate, Lester Dobbey, who worked in the law library, also observed moldy books in 2017, Pl.'s Ex. 8, Dobbey 10/6/17 Grievance ("Dobbey 10/6/17 Grievance"), at 54, ECF No. 94, and helped dispose of at least 300 mold-ridden books in October 2017. Pl.'s Ex. 9, Dobbey

---

[4]     Paragraph 16 of Jones's Statement of Additional Facts states: "Plaintiff recalls that the conversation with Defendant Pfister had to do with the black mold and mildew that permeated all throughout Stateville, including, but not limited to the law library." Pl.'s SOAF ¶ 16 (citing Jones Dep. at 40:16). But the cited portion of Jones's deposition does not support that fact statement. Jones testified that he does not recall when a conversation between him and Pfister took place, where the conversation occurred, what he said to Pfister, or what Pfister said in response. Jones Dep. at 41:2-18. Because Jones admitted in a sworn deposition that he does not recall any details about the conversation's subject matter, his assertion that the conversation must have "had something to do with the black mold" cannot be used to oppose summary judgment. *Id.* at 41:9–12; *see also* Pl.'s Resp. Br. at 29, ECF No. 94.

Grievance ("Dobbey 10/13/17 Grievance"), ECF No. 94. But, according to Jose Rodriguez, who worked in the library from 2007 to 2019, the library still had moldy books, moldy shelving, moldy ceiling tiles, and portions of moldy carpet that were not completely removed from the law library until 2018. Rodriguez Decl. ¶¶ 1, 9–12, at 108.

### 2. Showers in the E-Unit

Jones also claims that the showers in the E-Unit were permeated throughout with mold. Pl.'s Ex. 24, Jones 10/25/19 Decl. ("Jones 10/25/19 Decl.") ¶ 5, at 105, ECF No. 94. According to Jones, he suffered from breathing impairments and sinus issues from being exposed to the mold. Jones Dep. at 35:11–22.

### 3. Other Areas

That is not all. Jones adds that virtually every area in Stateville contained mold. Defs.' SOF ¶ 7. But his position contradicts his own deposition testimony, and a party "cannot circumvent the purpose of summary judgment 'by creating sham issues of fact that contradict their prior depositions.'" *See Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 0319, 2020 WL 996498, at *2 (N.D. Ill. Mar. 2, 2020) (cleaned up) (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) (collecting cases)), *appeal docketed*, No. 20-1705 (7th Cir. Apr. 28, 2020). For example, Jones asserts that his cell had mold, but he stated under oath that he could not know for sure whether this was the case, because he believes the mold had been painted over. Jones Dep. at 35:22–36:1. Jones also insists that there was mold in the ventilation ducts, but he admitted under oath that he did not know whether, in fact, there was mold in the vents. *Id.* at 37:9–14.[5] In the same vein, Jones asserts he had heard that a sergeant had complained

---

[5]     While Jones states he has documentation from an inmate-painter establishing that he had merely painted over mold in the E-Unit and that there was mold in the vents, *id.* at 36:6–10, the documentation falls short of supporting his assertions. The inmate-painter's grievance form does not say that he merely

about mold in the kitchen, but there is no evidence that Jones was personally aware of that fact. *See* Jones Dep. at 62:14–23.

## B.    Jones's Grievances About Mold

Jones testified that he was familiar with the grievance process from reading the inmate handbook and working in the law library while incarcerated at Stateville.  Defs.' SOF ¶ 24; Jones Dep. at 19:21–24, 20:1; *see* Defs.' Ex. D, Inmate Grievance History, at 1, ECF No. 88-7.  That process requires inmates to resolve a grievance through a counselor, and, if that does not resolve the issue, the inmate is required to submit a written form to the designated grievance officer within sixty days of the problem causing the grievance.  Defs.' SOF ¶ 18.[6]

The designated grievance officer investigates the matter and reports factual findings and recommendations to the warden, who then reviews the information and issues a decision to the prisoner granting or denying the requested relief.  *Id.* ¶ 19.  If the prisoner is still dissatisfied, the inmate may appeal the warden's decision to the Administrative Review Board ("ARB") within thirty days.  *Id.* ¶ 20.  Only after the ARB makes a final determination with respect to the grievance is the inmate's administrative remedy fully exhausted.  *Id.* ¶ 23.  Alternatively, a prisoner may file

---

painted over mold and does not mention mold in the vents.  *See* Pl.'s Ex. 17, Ames Grievance, at 84, ECF No. 94.  And, although the inmate-painter complained of peeling paint revealing black mold, the grievance was dated February 9, 2009, and Jones does not provide any evidence that he personally was exposed to those same conditions during the relevant time period.  *Id.*; *see, e.g.*, Pl.'s Ex. 33, Work Request Log, at 190 (painter scraped off loose paint, cleaned or washed mold, and then painted areas in E-House in August 2016), ECF No. 94.

[6]     The Illinois Department of Corrections has a formalized, three-step grievance process for prisoners. *See* 20 Ill. Admin. Code § 504.800 *et seq.*; *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016).  The prisoner must first address a grievance to his or her counselor or a prison grievance officer.  20 Ill. Admin. Code § 504.810(a).  The grievance officer reports his or her findings and recommendations in writing to the facility's chief administrative officer (*i.e.*, the warden or a designee).  *Id.* § 504.830(e).  The chief administrative officer then advises the offender in writing of his or her decision.  *Id.*  If, after receiving the response of the chief administrative officer, the offender still believes that the problem has not been satisfactorily resolved, the offender may appeal in writing to the IDOC director.  *Id.* § 504.850(a).

a grievance directly with the warden or designee requesting that it be handled on an emergency basis. *Id.* ¶ 21.[7]

Jones submitted an emergency grievance about the moldy carpet caused by law library's leaky roof on December 2, 2014. Pl.'s Ex. 7, Jones 12/2/14 Grievance ("Jones 12/2/14 Grievance") at 50, ECF No. 94. The grievance counselor noted that "the proper procedures have been taken" and that the "Warden's [sic] have been notified and work orders have been submitted for roof." *Id.* Warden Williams concluded that emergency relief was not necessary. *Id.*

Jones submitted two additional grievances regarding the mold at Stateville. *Id.* ¶ 26. The first grievance was dated December 30, 2015 (the "December 2015 Grievance"), and the second was dated February 5, 2016 (the "February 2016 Grievance"). *Id.* Both grievances complained about the water that was leaking from the library roof over the course of many years, resulting in mold growth on the books, walls, carpet, and ceiling. *See* Defs.' Group Ex. D, Jones 12/30/15 Grievance at 4, Jones 2/5/16 Grievance at 9, ECF No. 88-7. Jones described the issue as an on-going problem. *Id.* at 5, 10. In support, Jones referred to the occasions when Calloway and other officials had noted the moldy books and affected areas in the library. *Id.* at 7, 12. Jones requested an inspection of the library as well as the living units and showers in Unit E-House, and the removal of any mold found at those locations. *Id.*

Jones submitted the December 2015 Grievance directly to Pfister on an emergency basis. *Id.* ¶ 28. Pfister's designee, however, determined that there was no emergency and instructed Jones

---

[7]     If a prisoner sends his grievance directly to the warden seeking emergency relief, the warden or a designee may treat the grievance on an emergency basis "[i]f there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender." 20 Ill. Admin. Code § 504.840(a). If the warden or designee determines that the grievance should be handled on an emergency basis, then he or she will expedite processing of the grievance. *Id.* § 504.840(b). If, on the other hand, the warden or designee determines that the grievance should not be handled on an emergency basis, then the offender is notified in writing of that determination. *Id.* § 504.840(c).

to submit his grievance using the standard procedure. Defs.' Group Ex. D, 12/30/15 Grievance ("12/30/15 Grievance") at 9, ECF No. 88-7. Jones instead filed the grievance with the ARB. Defs.' SOF ¶¶ 27, 31. The ARB rejected the grievance on January 12, 2016 and returned it to Jones with instructions to provide copies of the grievance officer's and warden's responses. Defs.' Group Ex. D, Administrative Review Board Return of Grievance or Correspondence at 8, ECF No. 88-7.

Eventually, Jones followed the standard procedure and filed the February 2016 Grievance. Defs.' SOF ¶ 29. The counselor and grievance officer denied relief. Defs.' Group Ex. D, 2/5/16 Grievance ("2/5/16 Grievance"), at 3–4, ECF No. 88-7; Defs.' Ex. E, McBee Decl. ("McBee Decl.") ¶ 9, ECF No. 88-8. Defendants have not stated whether Pfister reviewed this grievance. The ARB ultimately denied relief based on untimeliness, stating that Jones had failed to file a grievance within sixty days after the discovery of the incident that gave rise to his grievance. Defs.' SOF ¶ 30; Defs.' Group Ex. D, Inmate Grievance History at 2–4.[8]

## III.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). At the summary judgment stage, it is not the Court's role to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020).

---

[8]     There is no record of any other grievance filed by Jones regarding mold at Stateville other than these. Defs.' SOF ¶ 26; McBee Decl. ¶¶ 6–8.

### IV. <u>Analysis</u>

Defendants' primary argument is that Jones has not exhausted his administrative remedies. In the alternative, they argue that Jones's Eighth Amendment claim fails on the merits. Lastly, Defendants assert they should be afforded qualified immunity.

### A. **Exhaustion**

The Prison Litigation Reform Act of 1996 contains a comprehensive administrative exhaustion requirement. Under that statute, "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The primary purpose of requiring prisoners to exhaust administrative remedies "is to give the prison an opportunity to address the problem *before* burdensome litigation is filed." *Chambers v. Sood*, 956 F.3d 979, 983 (7th Cir. 2020). Courts in this circuit take a "strict compliance approach to exhaustion." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011).

In order to exhaust administrative remedies, an inmate must comply with the rules established by the State with respect to the form, timeliness, and content of grievances. *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023–25 (7th Cir. 2002). If a prisoner fails to properly exhaust his administrative remedies, he may lose his right to sue. *Fleming v. Ill. Dep't of Corr.*, No. 16 CV 50074, 2017 WL 1833207, at *3 (N.D. Ill. May 8, 2017). That said, a prisoner does not bear the burden of pleading and proving exhaustion. *Jones v. Bock*, 549 U.S. 199, 212 (2007). Rather, the defendant bears the burden to show that an inmate did not properly exhaust available remedies. *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).

"To properly exhaust a prison grievance in Illinois, a prisoner must file it on time and in the right manner." *Macon v. Mahone*, 590 F. App'x 609, 611 (7th Cir. 2014). "A timely grievance

is filed within 60 days of the 'discovery of the incident, occurrence, or problem that gives rise to the grievance.'" *Id.* (quoting 20 Ill. Admin. Code § 504.810(a)). "[A] grievance is untimely if it is not filed within 60 days of the problem giving rise to the grievance[.]" *Ward v. Hoffman*, 670 F. App'x 408, 410 (7th Cir. 2016); *see also Macon*, 590 F. App'x at 612 (where prisoner was aware in 2010 that prison doctors might have been ignoring warning signs of his kidney disease, his 2011 grievance was untimely). *But see Pyles*, 829 F.3d at 865 ("Illinois, to its credit, does not have a hard-and-fast ban against considering untimely grievances. Instead, it provides that a grievance filed after the expiration of 60 days 'shall be considered' if it 'was not timely filed for good cause.'" (quoting 20 Ill. Admin. Code 504.810(a))).

## 1. Calloway and Williams

The ARB concluded that Jones's February 2016 grievance, which was identical to his December 2015 Grievance, was untimely. *Id.* ¶ 30. This conclusion is correct as to Calloway and Williams. The parties agree that Calloway and Williams had left Stateville by June 16, 2015, and July 13, 2015, respectively. Defs.' SOF ¶¶ 2, 4. Thus, they had been gone for six months by the time that Jones filed the earlier of his two grievances on December 30, 2015. Nor can Jones claim that he had only discovered the mold issues within sixty days of his December 2015 grievance, given his prior grievance complaining of the moldy carpet in the library in December 2014. *See* Jones 12/2/14 Grievance at 50. Accordingly, to the extent that Jones's grievances targeted conduct by Calloway or Williams, they were untimely, and the Court grants summary judgment in their favor given Jones's failure to satisfactorily exhaust his administrative remedies as to them.

## 2. Pfister

The parties also agree that Pfister's first day as Warden at Stateville was November 12, 2015. Defs.' SOF ¶ 3. As such, he cannot be liable for any events that occurred prior to that date.

That said, to the extent that Jones's 2015 and 2016 grievances were premised on the ongoing mold problems in the law library, his cell, and showers in the E-Unit, the Court finds that Jones has exhausted his administrative remedies as to these claims against Pfister.

In response, Defendants argue that Jones's grievances appear to deal only with the library area. But his grievances encompassed much more. In the December 2015 grievance, Jones stated:

> This grievance is being brought forward to address the deplorable and toxic conditions of the prison's law library. The law library is infested with black mold on the law books, walls, ceilings, and the carpet is really soiled. The excessive leakage from the roof has led to [a] deplorable and toxic environment[.] [J]ust recently over the holiday season, the roof has completely caved in, and the stench from the carpet being wet over the years is overpowering.
>
> ***
>
> [T]he Grievant had to submit a request to the Health Care Unit because of breathing complications stemming from the conditions at the Law Library, *and the Cellhouses, which include the showers*.

December 2015 Grievance (cleaned up and emphasis added).

After referring to these conditions, Jones requested the following relief:

> (1) that the infected areas *in the Law Library, Living Unit and Shower in Unit E-House* with toxic black mold incubating between the slabs of concrete be inspected and removed by a professional removal service; (2) that the wet and toxic black mold and mildewed legal books be destroyed and replaced; [and] (3) that Complainant/Grievant be seen by a professional with expert experience treating fungal infections and an MRI be administered with corrective drug therapy to determine the extent of this fungal infection, etc. from an outside medical source with another diagnosis other than Stateville's medical personnel.

*Id.* (cleaned up and emphasis added).[9]

---

[9] Although Defendants argue that Jones failed to exhaust his remedies as to Pfister because he was not specifically named in the grievances, the Court disagrees. A "grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *See Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). To the extent that

Furthermore, Defendants concede that, because Jones submitted his emergency December 2015 Grievance prior to the 2017 amendment to the Illinois Administrative Code, he was not required to resubmit the grievance using the standard procedures after the warden's designee determined that no emergency existed. *See Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 832–35 (7th Cir. 2020); *see also Jones v. Bayler*, 834 F. App'x 283, 285 (7th Cir. 2021) (holding that, prior to 2017, a "prisoner's appeal of the 'no emergency' ruling to the Board, without resort to the standard process, sufficed for exhaustion"). In short, because Jones complained of continuous and ongoing mold problems that existed when he filed his December 2015 Grievance and his identical February 2016 Grievance, his grievances were timely as to Pfister, and Jones has properly exhausted his administrative remedies as to this claim. Accordingly, the Court denies summary judgment as to Pfister on exhaustion grounds and turns to the claim's merits.

## B.    Eighth Amendment Claim Against Pfister

"The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon jail officials the duty to 'provide humane conditions of confinement' for prisoners." *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "A prison official who acts with deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Eagan v. Dempsey*, --- F.3d ----, No. 17-3184, 2021 WL 456002, at *18 (7th Cir. Feb. 9, 2021).

---

Defendants rely on authority that involved a particular correctional officer or counselor, the Court finds their authority distinguishable because, in those cases, the alleged deprivation did not concern an obvious roof failure and mold conditions that had been brought to the attention of several administrators and wardens. *See generally* Letter to Administration; Warden Calloway Mem.; Chief Engineer's Resp. 12/5/15 Patterson Grievance. Nor does Defendants' statement of facts assert that Pfister was unaware of moldy condition of the law library.

"A § 1983 claim based upon a violation of the Eighth Amendment has both an objective and a subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

### 1.    Whether Jones's Injuries Were Objectively, Sufficiently Serious

Jones focuses on his sinus problems that he attributes to the mold issues at the facility. *See* Pl.'s Resp. Br. at 26. In response, Pfister argues that Jones's sinus issues were not objectively serious. It is true that "not every injury . . . suffered by a prisoner translates into constitutional liability for prison officials responsible for the prisoner's health and well-being." *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999). The injury "must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 834; *Fisher v. Lovejoy*, 414 F.3d 659, 661–62 (7th Cir. 2005). "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (cleaned up).

The Seventh Circuit's ruling in *Henderson*, 196 F.3d at 842, is instructive. There, an inmate brought a civil rights suit for deliberate indifference, asserting that he was suffering from a variety of symptoms, including sinus issues, after having been exposed to secondhand smoke. The Seventh Circuit affirmed the dismissal of the inmate's claims, holding that "the injuries of which Henderson complains—breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy—are, objectively speaking, relatively minor." *Id.* at 846. In so holding, however, the court emphasized that Henderson had not stated that any physician had

treated him for any condition or ailment that was allegedly brought about by his exposure to secondhand smoke. *Id.*

By contrast, when Jones sought treatment for smelling an ammonia-like chemical odor, Stateville's medical director diagnosed Jones with maxillary sinusitis, prescribed medication to treat his sinusitis, and ordered x-rays. *See* Pl.'s Ex. 44, X-Ray Requisition at 331, ECF No. 94; Pl.'s Ex. 47, Medical Record at 337, ECF No. 94. Pfister concedes that x-rays were ordered of Jones's maxillary sinus, but he contends that Jones did not receive any medication for his complaints. Defs.' SOF ¶ 35. The record, however, notes that the medical director did prescribe an antibiotic for Jones's condition. *Compare id.*, *with* Pl.'s Ex. 47, Medical Record at 337 (prescribing Bactrim). Because Jones's sinusitis was diagnosed by a physician as mandating treatment, he has created a genuine issue of fact as to whether his condition was objectively, sufficiently serious.

Pfister also contests causation, pointing to the fact that no medical professional has ever told Jones that his sinusitis was mold-related. But "[p]roximate cause is a question to be decided by a jury" and "[e]xpert testimony is not always necessary to establish causation[.]" *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010); *see also Roe v. Elyea*, 631 F.3d 843, 865 (7th Cir. 2011) (affirming a jury verdict where a plaintiff lacked expert testimony as to causation). Here, Jones's medical records show that Jones started to experience problems with his sense of smell only after he began working in the library. *Compare* Pl.'s Ex. 48, Medical Record at 339, ECF No. 94 (stating that sense of smell has been affected since 2011), with Defs.' SOF ¶ 6 (stating that Jones's tenure as clerk in the library started in 2011). From this a jury could reasonably infer a causal connection between Jones's exposure to mold and his sinusitis.

## 2. Whether Pfister Was Deliberately Indifferent to a Substantial Risk to Jones's Health and Safety

Deliberate indifference requires that an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "The infliction must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable." *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996). But an inmate claiming an Eighth Amendment violation "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Pfister argues that no reasonable juror could find that he had personal knowledge of a substantial risk to Jones's health and safety. To his point, nothing in the record indicates that Pfister personally reviewed Jones's grievances. Thus, to satisfy this element of his claim, Jones must provide evidence that mold problems were so prevalent throughout the facility that a reasonable jury could infer that Pfister must have known about them. *See Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) (stating that "defendants such as the Sheriff and the Director of the Jail can realistically be expected to know about or participate in creating systematic jail conditions"); *see also Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) ("Even if Gray had

17

never filed the grievance, a jury could infer that the warden was aware of the pest infestations in the facility."); *Eason v. Pritzker*, No. 18-cv-2553, 2020 WL 6781794, at *5 (N.D. Ill. Nov. 18, 2020) ("A systemic violation means a general prison condition that affects a widespread group of inmates.").

### a.  Mold in the Law Library

A rational juror could conclude from this record that the mold issues at the law library posed such a problem that Pfister was likely aware of them.  Stateville's law library is accessible to widespread group of inmates for legal research.  *See, e.g.*, Pl.'s SOF ¶ 6; 12/30/15 Grievance at 9; Dobbey 10/6/17 Grievance at 54; Pl.'s Ex. 14, Centeno Grievance  at 70, ECF No. 94; Patterson Aff. ¶ 2 at 101; Jones Aff. ¶ 1 at 103  And Jones points to evidence that the wardens in charge of the facility in February 2015 were aware of his December 2, 2014, grievance.  Pl.'s 12/2/14 Grievance at 50 (stating that the wardens had been notified).  And Calloway acknowledged that, of the library's substantial book collection, only two carts of books were free of mold.  Calloway Mem. at 49.

Furthermore, the poor conditions in the library and the resulting mold infestation were long-standing.  For example, an inmate, Ricky Patterson, states that the library suffered from a leaky roof and mold throughout the period from 2003 to 2016.  Patterson Aff. ¶ 2 at 101; *see also* Jones Aff. ¶ 1.  And the record indicates that large containers were regularly placed throughout the library to catch water and that the carpet had a foul stench.  Pl.'s SOAF ¶ 7; Chief Engineer's Resp. 12/5/15 Patterson Grievance at 76; Patterson Aff. ¶ 2 at 101; Jones Aff. ¶ 2 at 103.  The poor conditions at the library were confirmed by Stateville's engineering department's conclusion of ongoing structural problems with the roof.  Chief Engineer's Resp. 12/5/15 Patterson Grievance at 76.

This is not all. Although Calloway in 2014 and Chief Engineer Daly in 2015 had ordered that all moldy books be removed from the library and discarded, mold-ridden books were still there as late as 2017 and 2018. Dobbey 10/6/17 Grievance at 54; Pl.'s Ex. 25, Rodriguez Decl. ("Rodriguez Decl.") ¶¶ 1, 9–12 at 108, ECF No. 94. And the moldy shelving, the moldy ceiling tiles, and the moldy carpet were not completely removed from the law library until 2018. Rodriguez Decl. ¶¶ 1, 9–12 at 108. *But see* Chief Engineer's Resp. 12/5/15 Patterson Grievance at 76 (stating in response to a grievance filed in December 2015, that, in early 2016, the carpeting had been recently removed). Given the immense scope of the problem and the many attempts by the senior staff at Stateville to address it over the years, a reasonable jury could find that Pfister was well aware of it and knew that the conditions could posed a substantial risk to the health of inmates. Accordingly, summary judgment is denied on this ground.

### b. Mold in the E-Unit Showers

The record also contains evidence of mold in the showers in the E-Unit. According to Jones, the showers[10] were permeated with mold in 2015 and 2016. Pl.'s Ex. 24, Jones 10/25/19 Decl. ("Jones 10/25/19 Decl.") ¶ 5, at 105, ECF No. 94. He also points to inmate Patterson, who attests that the showers within the B-, C-, D-, E-, and F-Units were ridden with mold during that time and that he had filed grievances about them. *See* Patterson Aff. ¶¶ 1, 3 at 101–02; Patterson Grievance at 79.

Although Pfister might not be expected to be aware of mold in the showers of a single living unit, a reasonable jury could find that a mold problem in the showers of five living units

---

[10] Although Jones' 10/25/19 Declaration also attests that mold could be seen in the showers in the F-Unit, Jones's grievances did not include any mention of F-Unit; therefore, Jones has not exhausted his administrative remedies as to that claim. *Compare* 12/30/15 Grievance at 9, *and* 2/5/16 Grievance at 3–4, *with* 10/25/19 Jones Decl. ¶ 5 at 105.

was sufficiently widespread to have alerted him of the issue. Accordingly, Jones has raised a genuine issue of fact as to whether Pfister was aware of moldy showers in E-Unit at Stateville.

### c. Mold in Other Areas at Stateville

As for areas at Stateville other than the library and showers, for the reasons discussed above, Jones has not cited any admissible evidence to support his claim of a mold problem that was so pervasive to have alerted Pfister. The Court thus grants summary judgment to Pfister as to Jones's claim of mold in other areas at Stateville.

## C. Qualified Immunity

That leaves Pfister's argument that he is entitled to qualified immunity as to Jones's surviving claims. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). The court "must determine (1) whether facts alleged or shown by a plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Lewis v. City of Chi.*, 914 F.3d 472, 477 (7th Cir. 2019).

As explained, when all of the disputed material facts in the summary judgment record are viewed in the light most favorable to Jones, a reasonable jury could find that he has established that Pfister violated the Eighth Amendment by ignoring the mold issues in the library and E-Unit showers that caused Jones's respiratory ailments. And both the Supreme Court and the Seventh Circuit have recognized many years ago that an inmate has a constitutional right to breathe non-toxic air. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33–35 (1993) (holding that prison officials' involuntarily exposing inmate to environmental tobacco smoke that posed an unreasonable risk of

serious health problems stated an Eighth Amendment claim). *See Board v. Farnham*, 394 F.3d 469, 487 (7th Cir. 2005) (denying qualified immunity based on *Helling* where inmate claimed deliberate indifference based on an unhealthy ventilation system).[11]  Accordingly, Pfister's request for qualified immunity is denied.

### V.  Conclusion

For the reasons discussed above, Defendants' motion for summary judgment motion is granted in part and denied in part.  Summary judgment is granted in favor of Defendants Williams and Calloway.  Summary judgment also is granted as to Defendant Pfister to the extent that Jones's claim is based upon conditions at Stateville prior to November 12, 2015, as well as areas other than the law library and E-Unit showers.  In all other respects, the motion is denied.

**IT IS SO ORDERED.**                             **ENTERED:**

**JOHN Z. LEE**
**United States District Judge**

---

[11]     Although Defendants rely on a single district court case to establish that the right was not clearly established, the Court "look[s] first to controlling Supreme Court precedent[.]"  *Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000).